1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

In re: JAMES T. ANDERSON, as owner
of the sailing vessel, CATSHOT, a 44-Foot
Voyage Catamaran, for Exoneration from
Limitation of Liability,

Case No.  C09-1436RSL

ORDER GRANTING PLAINTIFF'S
MOTION FOR LIMITATION AND
SUMMARY JUDGMENT IN PART

This matter comes before the Court on Limitation Plaintiff James T. Anderson's

Motion for Limitation and Summary Judgment (Dkt. # 19) and his subsequent "Request

for Ruling" (Dkt. # 35).  He again asks the Court to conclude that he is entitled to limit

his liability under the Limitation of Liability Act, 46 U.S.C. § 30505, to the value of his

vessel, the CATSHOT, at the end of the voyage.  He also asks the Court to dismiss the

Jones Act claim, 46 U.S.C. § 688, brought against him by Counter-Claimant Sonia

Beckham, the widow of one of the CATSHOT's deceased crew members.

In its prior Order (Dkt. # 31), the Court found that the Death on the High Seas Act

("DOHSA"), 46 U.S.C. §§ 30301–30308, preempted Ms. Beckham's common law

negligence and unseaworthiness claims and dismissed them.  It otherwise continued the

motion, though, to provide Ms. Beckham an opportunity to take the steps necessary to

attain statutory standing to bring a DOHSA or Jones Act claim.  Dkt. # 31.  Plaintiff does

not challenge Ms. Beckham's representation that she now has standing.  Compare

Amended Complaint (Dkt. # 34) at 5 ¶ 1.1, with Dkt. # 35 (declining the Court's

1   invitation to amend his motion).  According, the remainder of the motion is now ripe for

2   adjudication.

3       For the reasons set forth below, the Court GRANTS the motion IN PART.  The

4   Court DISMISSES Counter-Claimant's Jones Act claim and her requests for non-

5   economic and punitive damages.  It further FINDS that Plaintiff is entitled to limit his

6   liability to the value of his vessel at the end of the voyage.

7                                    **I. BACKGROUND**

8       The circumstances underpinning this suit are tragic.  In early December 2006,

9   Plaintiff's catamaran was lost off the coast of Oregon.  Complaint (Dkt. # 1) at ¶¶

10  2.12–2.13.  Of the three sailors assumed to be aboard, none were found alive.  Id. at ¶

11  2.15.  Only Richard Beckham's body has ever been recovered.  Id.

12      Notably, the CATSHOT was a young ship.  Plaintiff had contracted to purchase

13  her in February 2006 from her South African builder, Voyage Yachts Ltd.  Anderson

14  Decl. (Dkt. # 21) at 1.  The purchase price included delivery by Voyage Yachts' "in-

15  house delivery crew" to Port Townsend, Washington.  Id. at 2; see Dkt. # 25 at 23

16  (Schedule C of the Agreement of Sale).  When it came time for delivery, however,

17  Voyage Yachts informed Plaintiff that its crew would not be available to deliver the ship.

18  Anderson Decl. (Dkt. # 21) at 2; Opp. Decl. (Dkt. # 27-1) at 17–18.  Instead, Voyage

19  Yachts contracted with Reliance Yacht Deliveries, Ltd., to deliver CATSHOT to Plaintiff.

20  Anderson Decl. (Dkt. # 21) at 2; Opp. Decl. (Dkt. # 27-1) at 17–18.  Reliance placed

21  Captain John Anstess in command of the vessel and a small crew.  Opp. Decl. (Dkt. # 27-

22  1) at 18–19.  After Anstess equipped the CATSHOT with an Italian-made life raft, he set

23  sale from South Africa in August.  Opp. (Dkt. # 27-1) at 48–49, 54–55.  Per South

24  African law, Plaintiff took title to the CATSHOT prior to departure.  Anderson Decl.

25

26  ORDER GRANTING PLAINTIFF'S MOTION FOR
    LIMITATION AND SUMMARY JUDGMENT IN PART - 2

1  (Dkt. # 21) at 2.

2       Along the way, there were many setbacks.  Due to weather conditions, the

3  CATSHOT had to return to Aruba.  Opp. Decl. (Dkt. # 27-1) at 106.  In Trinidad, two of

4  the original three crewmen decided to "jump ship"—a decision that delayed the ship's

5  progress for several weeks as Reliance looked for replacement crew members with "more

6  staying power."  Id.  Though replacements were eventually found and flown to Trinidad,

7  id. at 100, they too did not last long.  Both left the vessel in Marina del Rey, California, a

8  move that prompted Captain Anstess to hire Beckham and a third person to help him

9  complete the delivery.  Amended Answer (Dkt. # 34) at 5–6 ¶ 1.3.

10      Unfortunately, that crew would never reach its destination.  After stopping again in

11  San Francisco, the ship was caught in a severe storm "approximately 10 nautical miles

12  west of the shoreline at or near Lincoln City, Oregon."  Id. at 6 ¶ 1.4.  In winds in excess

13  of 100 mph, the CATSHOT is believed to have capsized and broken apart.  See id. at 6

14  ¶ 1.5.  The entire crew is believed dead, though, as noted, Beckham's body was the only

15  one ever recovered.

16      Following the death of her husband, Counter-Claimant filed a wrongful death suit

17  against Plaintiff, Voyage, Reliance, and the estate of John Anstess in Los Angeles

18  Superior Court.  Complaint (Dkt. # 1) at ¶ 2.17.  Plaintiff learned of the suit on April 27,

19  2009.  Id. at ¶ 2.18.  He filed a motion to quash for lack of personal jurisdiction, which

20  was granted on June 11, 2009.  Id. at ¶ 2.19.  Counter-Claimaint subsequently refiled

21  against him in King County Superior Court.  Id. at ¶ 2.20.  Plaintiff responded by filing

22  the instant limitation action with this Court on October 13—a few weeks before the

23  expiration of the six-month period for doing so.  See 46 U.S.C. § 30511(a) ("The owner

24  of a vessel may bring a civil action in a district court of the United States for limitation of

25

26  ORDER GRANTING PLAINTIFF'S MOTION FOR
    LIMITATION AND SUMMARY JUDGMENT IN PART - 3

1   liability under this chapter. The action must be brought within 6 months after a claimant
2   gives the owner written notice of a claim.").

3       The next day, the Court stayed all pending actions against Plaintiff and CATSHOT
4   arising from this incident and enjoined any further actions. It ordered that any party that
5   wished to file a claim against Plaintiff do so by filing a claim in this matter no later than
6   November 23, 2009. See § 30511(c). Only Sonia Beckham filed a claim.

7                                    **II. DISCUSSION**

8       The Court can grant Plaintiff's motion only if it is satisfied that there is no genuine
9   issue of material fact and that judgment is appropriate as a matter of law. Fed. R. Civ. P.
10  56(c). As the moving party, Plaintiff bears the initial burden of informing the Court of
11  the basis for summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). He
12  must prove each and every element of his claims or defenses such that no reasonable jury
13  could find otherwise. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In
14  doing so, he is entitled to rely on nothing more than the pleading themselves. Celotex,
15  477 U.S. at 322–24. Only once he makes that initial showing does the burden shift to the
16  nonmoving party to show by affidavits, depositions, answers to interrogatories,
17  admissions, or other evidence that summary judgment is not warranted because a genuine
18  issue of material fact exists. Id. at 324.

19      To be material, the fact must be one that bears on the outcome of the case. A
20  genuine issue exists only if the evidence is such that a reasonable trier of fact could
21  resolve the dispute in favor of the nonmoving party. Anderson, 477 U.S. at 249. "If the
22  evidence is merely colorable . . . or is not significantly probative . . . summary judgment
23  may be granted." Id. at 249–50. In reviewing the evidence "the court must draw all
24  reasonable inferences in favor of the nonmoving party, and it may not make credibility

25
26  ORDER GRANTING PLAINTIFF'S MOTION FOR
    LIMITATION AND SUMMARY JUDGMENT IN PART - 4

1  determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Prods. Inc.</u>, 530

2  U.S. 133, 150 (2000).

3      With these standards in mind, the Court turns first to the question of whether

4  Plaintiff has demonstrated that he could not be liable to Counter-Claimant under either

5  the Jones Act or DOHSA.  It then considers whether Plaintiff is nonetheless entitled to

6  limit his liability under § 30505 to the value of the CATSHOT at the end of its voyage.

7  **A. The Counter Claims**

8      As discussed, Counter-Claimant has alleged that Plaintiff is liable both under the

9  Jones Act and for common law negligence and unseaworthiness.  The Court has

10  previously found that DOHSA applies in this case to preempt Counter-Claimant's

11  common law claims. Dkt. # 31.  Accordingly, the Court considers whether Plaintiff has

12  demonstrated that no genuine issue of material fact exists as to his liability under either

13  the Jones Act or DOHSA and, if so, whether he is entitled to judgment as a matter of law.

14      **1. The Jones Act**

15      As amended, the Jones Act allows a "seaman injured in the course of employment

16  or, if the seaman dies from the injury, the personal representative of the seaman . . . [to]

17  bring a civil action at law, with the right of trial by jury, against the employer." 46 U.S.C.

18  § 30104.  The Act has two threshold requirements.  First, it provides a cause of action

19  only to injured seamen or their personal representatives.  <u>Id.</u>  Second, it limits that cause

20  of action to suits against the seaman's employer.  § 30104; <u>Cosmopolitan Shipping Co. v.</u>

21  <u>McAllister</u>, 337 U.S. 783, 787 n.6 (1949).

22      As noted, the first threshold requirement is no longer at issue.  Counter-Claimant

23  has been appointed the decedent's personal representative, at least to the extent relevant

24  to this action.  <u>See</u> Dkt. # 32-2.  The Court thus turns to the second requirement:  whether

25

26  ORDER GRANTING PLAINTIFF'S MOTION FOR
   LIMITATION AND SUMMARY JUDGMENT IN PART - 5

1  Plaintiff was decedent's employer.  Mot. (Dkt. # 19) at 10–13.  The Court thinks Plaintiff
2  makes a compelling case that he was not.

3      As an initial matter, the Court finds that Plaintiff has met his initial burden of
4  proving each and every element of his defense such that no reasonable jury could find
5  otherwise.  Anderson, 477 U.S. at 248.  Though "[w]hether an 'employer/employee
6  relationship' exists is . . . usually a question of fact that should go to the jury," Omar v.
7  Sea-Land Serv., Inc., 813 F.2d 986, 989 (9th Cir. 1987), the Supreme Court has noted that
8  there are circumstances under which it is clear that the required relationship does not
9  exist:  "One must look at the venture as a whole [to determine who a seaman's employer
10  was].  Whose orders controlled the master and the crew?  Whose money paid their
11  wages?  Who hired the crew?  Whose initiative and judgment chose the route and the
12  ports?"  Cosmopolitan, 337 U.S. at 795; see also Glynn v. Roy Al Boat Mgmt. Corp., 57
13  F.3d 1495, 1498–90 (9th Cir. 1995) (applying Cosmopolitan), overruled on other grounds
14  by Atl. Sounding Co., Inc. v. Townsend, 129 S. Ct. 2561 (2009).  And, in this case,
15  Plaintiff has demonstrated that each of these factors rests decidedly in his favor.

16      Certainly, it is clear that Plaintiff had no contact whatsoever with any of the crew
17  either prior to the CATSHOT setting sail or at any point during its journey.  He did not
18  even know their identities until after the CATSHOT was lost.  Opp. Decl. (Dkt. # 27-1) at
19  19–20.  And, as evidenced by his many emails to Reliance, Plaintiff had no ability to
20  control or even speak with the crew at any point.  Dkt. # 25 at ¶ 8; Opp. Decl. (Dkt. # 27-
21  1) at 17–22 (original crew members); id. at 100 (Trinidad replacements).  He was
22  completely dependent on Reliance, which had hired each of the crew members and was in
23  contact with them, to periodically updated him on the CATSHOT's status.

24      Moreover, Counter-Claimant's own evidence only bolsters Plaintiff's position.  It
25
26  ORDER GRANTING PLAINTIFF'S MOTION FOR
    LIMITATION AND SUMMARY JUDGMENT IN PART - 6

1   demonstrates that Reliance, not Plaintiff, hired and controlled the master and the crew.

2   See Opp. Decl. (Dkt. # 27-1) at 38, 40, 106.  When problems arose, Captain Anstess

3   contacted Reliance, not Plaintiff.  Id. at 47–50.  And Reliance, not Plaintiff, told Captain

4   Anstess and his crew what routes to take and when and where to sail.  Id. at 47.

5   Likewise, Counter-Claimant's evidence demonstrates that Reliance's money paid

6   the crew.  As discussed, Plaintiff paid Voyage a flat fee to have its crew deliver the

7   CATSHOT to Washington.  Id. at 17–18.  When Voyage realized it would not be able to

8   fulfill that agreement, it hired Reliance, and Reliance hired the crew.[1]  Id. at 18–19.  At no

9   point did Plaintiff have any input in these decisions, much less any financial

10   responsibility or control.  The Court flatly disagrees with Counter-Claimant's position

11   that the mere fact that Plaintiff paid Voyage to deliver his vessel means that he became

12   the employer of anyone who eventually took part in that delivery, no matter how

13   attenuated or unexpected.   Frankly, the only fact supporting Counter-Claimant's position

14   is the fact that Plaintiff had taken ownership of the CATSHOT prior to its departure from

15   South Africa.  Admittedly, that is a good starting point.  "Ordinarily, the shipowner is

16   also the employer of the seamen."  Matute v. Lloyd Bermuda Lines, Ltd., 931 F.2d 231,

17   236 (3d Cir. 1991).  However, as the Cosmopolitan test demonstrates, that is not always

18   the case, and, in this case, the Cosmopolitan factors demonstrate that the presumption

19   should not apply.[2]

20

_____

21   [1] In this regard, the Court thinks a compelling case could be made that the circumstances

22   at issue here are analogous to a demise charter and therefore subject to the same outcome.
     Plaintiff has not, however, raised that argument.

23   [2] In addition, if Counter-Claimant wishes to rely on an agency theory to hold Plaintiff

24   accountable for Reliance's actions, she should have presented some evidence in support.  Berg v.
     Fourth Shipmor Assocs., 82 F.3d 307, 311–12 & n.4 (9th Cir. 1996).  The Court will not simply

25   assume that Reliance acted as Plaintiff's agent, especially given the fact that Counter-Claimant's

26   ORDER GRANTING PLAINTIFF'S MOTION FOR
     LIMITATION AND SUMMARY JUDGMENT IN PART - 7

1    Because Plaintiff has met his burden of demonstrating prima facie entitlement to

2    judgment as a matter of law, and Counter-Claimant has submitted nothing to create even a

3    triable issue, the Court GRANTS Plaintiff's motion as to the Jones Act claim.

4    **2.  DOHSA**

5    Plaintiff raises only two arguments in regard to DOHSA.  First, he contends that

6    Counter-Claimant lacks standing to bring a DOHSA claim and that the statute of

7    limitations has since run.  For obvious reasons, that contention is now moot.[3]

8    Second, he contends that he is entitled to judgment as a matter of law on Counter-

9    Claimant's request for non-pecuniary damages for loss of consortium, etc., and for

10   punitive damages because DOHSA "limits recoverable damages in wrongful death suits

11   to 'pecuniary loss sustained by the persons for whose benefit the suit is brought.'"  Chan

12   v. Society Expeditions, Inc., 39 F.3d 1398, 1407 (9th Cir. 1994) (citation omitted).  The

13   Court agrees.  It is settled law in this circuit that DOHSA "preclude[s] recovery for

14   nonpecuniary losses, such as loss of society or consortium, for deaths that occur on the

15   high seas."  Id. (citations omitted).  "Punitive damages are therefore also unavailable

16   under DOHSA."  Bergen v. F/V St. Patrick, 816 F.2d 1345, 1347 (9th Cir. 1987).

17   Accordingly, the Court DENIES Plaintiff's motion to the extent he seeks complete

18   dismissal of Counter-Claimant's DOHSA claim and GRANTS Plaintiff partial summary

19   judgment to the extent he seeks to limit available damages.

20

21   own evidence so clearly demonstrates that Plaintiff had no right to control Reliance's daily

22   actions, suggesting that Reliance was Voyage's agent, not Plaintiff's.  See Schmidt v. Burlington
     N. & Santa Fe Ry. Co., 605 F.3d 686, 690–91 (9th Cir. 2010).

23

24   [3] Plaintiff elected not to supplement his motion following Counter-Claimant's
     amendment.  Dkt. # 35.  The Court will thus presume for purposes of this motion that Plaintiff
     has no specific objection to her standing.

25

26   ORDER GRANTING PLAINTIFF'S MOTION FOR
     LIMITATION AND SUMMARY JUDGMENT IN PART - 8

1

**B.  Limitation of Liability**

2

Finally, the Court turns to the issue of the Limitation of Liability Act, now codified

3

at 46 U.S.C. § 30505.[4]

4

In simple terms, the Act, which applies to both commercial vessels and non-

5

commercial "pleasure craft," Matter of Hechinger, 890 F.2d 202, 206 (9th Cir. 1989),

6

"limits shipowner liability arising from the unseaworthiness of the shipowner's vessel or

7

the negligence of the vessel's crew unless the condition of unseaworthiness or the act of

8

negligence was within the shipowner's 'privity or knowledge.'"  In re BOWFIN M/V,

9

339 F.3d 1137, 1137 (9th Cir. 2003) (per curiam).  Ascertaining whether a shipowner

10

may limit his liability is a two-step process.  Id.; Hechinger, 890 F.2d at 207.  "First, the

11

court must determine what acts of negligence or conditions of unseaworthiness caused the

12

accident."  Hercules Carriers, Inc. v. Claimant State of Fla., Dept. of Transp., 768 F.2d

13

1558, 1563–64 (11th Cir. 1985) (quoting Farrell Lines, Inc. v. Jones, 530 F.2d 7, 10 (5th

14

Cir. 1976)); accord Hechinger, 890 F.2d at 207.  "That is, a liability must be shown to

15

16

[4]  That section provides:

17

18

(a) In general.–Except as provided in section 30506 of this title, the liability of the owner of a vessel for any claim, debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending freight.  If the vessel has more than one owner, the proportionate share of the liability of any one owner shall not exceed that owner's proportionate interest in the vessel and pending freight.

19

20

21

(b) Claims subject to limitation.–Unless otherwise excluded by law, claims, debts, and liabilities subject to limitation under subsection (a) are those arising from any embezzlement, loss, or destruction of any property, goods, or merchandise shipped or put on board the vessel, any loss, damage, or injury by collision, or any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of the owner.

22

23

24

25

(c) Wages.–Subsection (a) does not apply to a claim for wages.

26

ORDER GRANTING PLAINTIFF'S MOTION FOR
LIMITATION AND SUMMARY JUDGMENT IN PART - 9

1  exist." <u>Hechinger</u>, 890 F.2d at 207.

2          "Second, the court must determine whether the shipowner had knowledge or

3  privity of those same acts of negligence or conditions of unseaworthiness" that caused the

4  accident. <u>Hercules</u>, 768 F.2d at 1564. "This burden is not met by simply proving a lack

5  of actual knowledge, for privity and knowledge is established where the means of

6  obtaining knowledge exist, or where reasonable inspection would have led to the requisite

7  knowledge." <u>Id.</u> The claimant bears the initial burden of establishing the unseaworthy

8  condition or negligence that served as the "causative agent." <u>Carr v. PMS Fishing Corp.</u>,

9  191 F.3d 1, 4 (1st Cir. 1999); <u>Hercules</u>, 768 F.2d at 1564. "If the claimant succeeds in

10  that first-stage endeavor, the burden then shifts to the shipowner to establish its lack of

11  privity and knowledge." <u>Carr</u>, 191 F.3d at 4 (citing <u>Hercules</u>, 768 F.2d at 1564).

12          In the present case, Counter-Claimant alleges a long list of unseaworthy and

13  negligent conditions in her amended answer, including:

14          – the failure to provide life vests or survival suits;

15          – the presence of a malfunctioning vessel tracking system;

16          – knowledge that "Master Captain John Anstess had no experience sailing

17            in the Northwest, and was unfamiliar in the area";

18          – knowledge that the weather conditions in December made travel unsafe;

19          – knowledge that prior crew members had departed the CATSHOT due to

20            safety concerns, yet refusing to allow the CATSHOT to be wintered in

21            California;

22          – knowledge that the CATSHOT had experienced stress related damage that

23            rendered it unsafe;

24          – knowledge that Anstess had concerns about the preferred route, yet

25

26  ORDER GRANTING PLAINTIFF'S MOTION FOR
    LIMITATION AND SUMMARY JUDGMENT IN PART - 10

1    refusing to allow him to proceed along his preferred route; and

2    – violation of "safety standards (no survival suits, no radar, no proper

3        communication gear, no proper life boat for ocean travel)."

4    Amended Answer (Dkt. # 34) at 6–8 ¶ 2.3.  And in her Opposition, she argues that

5    Plaintiff's knowledge of alleged unseaworthy conditions or negligence included, but was

6    not limited to:

7        (a) the Italian made life raft not being serviceable in the US [sic] and not Coast
         Guard approved, (b) the vessel not being equipped with the requisite safety or
8        emergency survival equipment, (c) the spotty reporting through Yacht-Control,
         (d) . . . the weather conditions in the Pacific Northwest where the vessel was
9        traveling during the period in question, (e) the ability to communicate directly
         with the vessel, (f) communications with Reliance regarding the vessel's
10       location and status, (g) the 2% discount on the purchase if the boat was shown
         at the Seattle Boat Show in January, and (h) the potential to earn 2% if a boat
11       was purchased at the Seattle Boat Show.

12   Opp. (Dkt. # 27-3) at 7.

13       Of this long list of alleged faults, the Court can dispense with some immediately.

14   In her responses to Plaintiff's interrogatories, Counter-Claimant has denied any allegation

15   of negligence on the part of Captain Anstess.  Dkt. # 20 at 9 (Interrogatory 14).  And, a

16   shipowner's "privity or knowledge" of unseaworthy conditions is limited to conditions

17   that exist "at or prior to the commencement of a voyage."  Hechinger, 890 F.2d at 207;

18   accord Hercules, 768 F.2d at 1563.  The same is true of post-departure acts of negligence.

19   Waterman S. S. Corp. v. Gay Cottons, 414 F.2d 724, 733–34 (9th Cir. 1969); see Admiral

20   Towing Co. v. Woolen, 290 F.2d 641, 648 (9th Cir. 1961).  Thus, those conditions that

21   arose post-departure, e.g., stress-related damage, crew departures, or changing weather,

22   have no bearing on limitation absent circumstances not raised here.

23       Having somewhat culled the allegations, the Court turns to those that remain.  As

24   the Court sees it, there exists five remaining categories of alleged fault:  (1) faulty safety

25

26   ORDER GRANTING PLAINTIFF'S MOTION FOR
     LIMITATION AND SUMMARY JUDGMENT IN PART - 11

equipment, including rafts, survival suits, etc.; (2) faulty tracking equipment; (3) faulty communication equipment; (4) negligence in selecting Captain Anstess to pilot the vessel; and (5) negligence in selecting the route given the weather and season.  The Court finds that none preclude summary judgment.  <u>See</u> <u>Anderson</u>, 477 U.S. at 248 ("[A] party opposing summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." (citation and internal quotation marks omitted)).

In regard to the safety equipment, Counter-Claimant concedes that the vessel was equipped with both life vests and a life raft and makes no allegation that these items did not function as intended.  She argues instead that more safety gear or better safety gear could have been provided.  However, that is not the standard.  "<u>The warranty of the ship owner is not one of unconditional safety</u>," but of <u>reasonable fitness</u> for "the purpose it was intended."  <u>Hechinger</u>, 890 F.2d at 207–08 (emphasis added) (citation omitted).  Thus, a vessel need only be "structurally fit and <u>reasonably safe</u> for the voyage."  <u>Id.</u> at 207 (emphasis added).  And Counter-Claimant has not provided any evidence to indicate that survival suits or any of the other items about which she complains (with the possible exception of the style of the life raft) are "standard equipment on presently manufactured [catamarans]" like the CATSHOT sailing in the Pacific Northwest.[5]  <u>Id.</u>; <u>cf.</u> Dkt. # 27-1 at 100.  To the contrary, while Plaintiff has admittedly equipped the CATSHOT II with

---

[5]  The Court notes that Counter-Claimant's own <u>inadmissible</u> evidence actually refutes her contention that the CATSHOT lacked a "EPIRB" or a flare gun. Dkt. # 27-41 at 71 (Coast Guard report noting presence of EPIRB and spent flare shells); <u>cf.</u> 46 U.S.C. § 6308(a) (providing that "no part of a report of a marine casualty investigation conducted under section 6301 of this title, including findings of fact, opinions, recommendations, deliberations, or conclusions, shall be admissible as evidence or subject to discovery in any civil or administrative proceedings, other than an administrative proceeding initiated by the United States").

ORDER GRANTING PLAINTIFF'S MOTION FOR
LIMITATION AND SUMMARY JUDGMENT IN PART - 12

1  some additional safety items, it still lacks survival suits.  Opp. (Dkt. # 27-3) at 5.

2       Moreover, even assuming that the safety equipment on board the CATSHOT, or

3  alleged lack thereof, amounted to an unseaworthy condition for which Plaintiff could be

4  liable, Counter-Claimant has presented no evidence that any of the alleged deficiencies

5  contributed to decedent's death.  Again, the only evidence currently before the Court is

6  that the CATSHOT and its crew were lost solely because they had the terrible misfortune

7  to be caught in a 100-mile-per-hour-wind storm off the coast of Oregon—"an Act of God

8  or peril of the sea."  Id. at 207–10.  Accordingly, she has failed to satisfy her burden of

9  establishing that "unseaworthiness caused the accident," i.e., the decedent's death, and

10 those conditions cannot preclude limitation.  Hercules, 768 F.2d at 1564; accord

11 Hechinger, 890 F.2d at 207; Carr, 191 F.3d at 4.

12      Counter-Claimant's remaining complaints fare no better.  Counter-Claimant's

13 communication complaint is rebutted by her own concession that the crew had a satellite

14 navigation phone on board.  Opp. (Dkt. # 27-3) at 4.  And her complaint about the

15 vessel's "spotty" tracking system, is rebutted by her concession that, "[b]ecause of the

16 tracking system, [Plaintiff] was aware at all times of the location of the CATSHOT."  Id.

17 Moreover, Counter-Claimant's self-contradicting positions are ultimately material given

18 that she has not shown that either alleged shortcoming had any bearing on the loss.

19      In regard to Captain Anstess, the Court finds that he had extensive experience as a

20 captain, both with catamarans and other vessels, and had received special training on

21 safety in rough sea waters.  Mot. (Dkt. # 19) at 4.  Counter-Claimant has offered nothing

22 to support her contention that his lack of specific experience sailing in the Pacific

23 Northwest rendered him unfit to captain the CATSHOT.  To the contrary, she has

24 specifically disclaimed any allegation that any actions of Captain Anstess contributed to

25

26 ORDER GRANTING PLAINTIFF'S MOTION FOR
   LIMITATION AND SUMMARY JUDGMENT IN PART - 13

1    or caused the loss of the CATSHOT and her crew, Dkt. # 20 at 9 (Interrogatory 14), and

2    her own evidence demonstrates that Captain Anstess knew exactly what he was getting

3    into, Dkt. # 27-1 at 48–50; Amended Answer (Dkt. # 34) at 6–8 ¶ 2.3. ("knowledge that

4    Anstess had concerns about the preferred route").

5        Finally, in regard to the route issues, the Court finds no negligence, and certainly

6    no causation.  Again, the cause for the tragic events that underlie this case was a sudden

7    100-mile-per-hour-wind storm off the coast of Oregon—"an Act of God or peril of the

8    sea."  That the route selected months before happened to place the CATSHOT and its

9    crew in the cross hairs of that storm cannot be considered an act of negligence.

10   Hechinger, 890 F.2d at 208–09.

11       In sum, Plaintiff has met his burden of demonstrating prima facie entitlement to

12   limitation.  Counter-Claimant has failed to rebut that showing.  Accordingly, the Court

13   GRANTS Plaintiff's motion as to limitation.

14                              **III.  CONCLUSION**

15       For all of the foregoing reasons, the Court GRANTS Plaintiff's motion IN PART.

16   Plaintiff is entitled to summary judgment on his assertion that he is not liable under the

17   Jones Act and is not liable under DOHSA for non-economic or punitive damages.

18   Furthermore, the Court finds that Plaintiff has demonstrated as a matter of law that he is

19   entitled to limit his liability under § 30505 to the value of the CATSHOT as of the end of

20   the voyage.  It presumes the parties will raise the issue of the CATSHOT's value at some

21   later date if they cannot reach some agreement among themselves.

22       DATED this 16th day of April, 2012.

23

24                              _Mkt S Lasnik_
                               Robert S. Lasnik
25                             United States District Judge

26   ORDER GRANTING PLAINTIFF'S MOTION FOR
     LIMITATION AND SUMMARY JUDGMENT IN PART - 14